IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ALVIS JACKSON WATKINS, JR.                                    PLAINTIFF

              v.            Civil No. 5:22-cv-05027-TLB-CDC

CORPORAL SHANNON SMITH (Badge #125),
Washington County Sheriff's Department                        DEFENDANT


## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff Alvis Jackson Watkins, Jr. ("Watkins) filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983.   On October 12, 2021, Watkins contends Corporal Smith wrongfully entered private property to arrest him and used excessive force against him during the arrest.   Specifically, Watkins maintains Corporal Smith deployed his taser against Watkins during the course of his arrest.

Pending before the Court is Corporal Smith's Motion for Summary Judgment (ECF Nos. 36-38) and his Supplemental Motion for Summary Judgment (ECF No. 46-47).[1]  Watkins has responded (ECF Nos. 42-43, 49-51).   The Motions are ready for decision.   The Honorable Timothy L. Brooks, United States District Judge, referred the case to the undersigned in accordance with 28 U.S.C. § 636(b)(1) and (3) for the purpose of making a Report and Recommendation on the pending Summary Judgment Motions.

### I.      BACKGROUND

On October 12, 2021, Watkins purchased a Hyundai from a friend. (ECF No. 38-8 at 19-

---

[1] The supplemental motion was filed at the request of the Court.   (ECF No. 44).   The original Motion did not address the issue of the legality of Corporal Smith's entry onto private property to arrest Watkins.

1

20). Watkins was aware the vehicle had a problem with its exhaust system. *Id.* Watkins began driving on West Double Springs Road, headed to his cousin's house which was approximately four miles away. *Id.* at 20. As the car heated up, Watkins began having problems with the transmission. *Id.* Watkins was being followed by a friend, Leslie Porter ("Porter") because the vehicle had not been licensed in several years. *Id.* at 21. Watkins attempted to get the vehicle off the road and into a driveway so he could work on it. *Id.* at 20. However, Watkins described that the vehicle would not "go forward . . .. [He] could only go backwards at a very slow rate." *Id.* at 22. Watkins asked Porter to push the vehicle forward so he could back into the driveway. *Id.* Watkins was beginning the process of rolling backward into the driveway when Corporal Smith came to a stop. *Id.* The patrol vehicle did not have its lights activated. *Id.* Porter drove away. *Id.* at 28. Watkins then called Porter to make sure she would go to his cousin's house and arrange for a truck and trailer. *Id.* At this point, Corporal Smith was still sitting in his vehicle. *Id.*

Watkins attempted to get the vehicle into park, but it kept "kicking back out to neutral." (ECF No. 38-8 at 29). Watkins indicates he was "trying to work my gear shift to try to get it where it would stay, trying to shut it off and turn it on to get the computer reset so it would engage in park." *Id.* Because the lights were not engaged on the patrol vehicle, Watkins believed Corporal Smith was just checking to see what was wrong with Watkins' vehicle. *Id.* When Corporal Smith left his patrol vehicle, he started walking toward Watkins. *Id.* at 30. From this point, the parties' viewpoints diverge.

### A.   Watkins' Viewpoint

According to Watkins, the following occurred: Watkins recognized Corporal Smith and said: "Smith, what are you doing?" (ECF No. 38-8 at 30 & 41). Corporal Smith then drew his

firearm, pointed it at Watkins, and ordered him to stop the car. *Id.* at 30. This action scared Watkins and he slowly rolled the car backwards.   *Id.* at 30-31. Watkins tried to get "far away" but Corporal Smith "just kept coming at me with his gun out."   *Id.* at 33. Corporal Smith asked if Watkins was trying to get away. *Id.* at 45. Because he was scared and nervous, Watkins says his foot came off the brake several times and he stepped on the gas causing the engine to "rev up."   *Id.* at 38. When Watkins did stop the car in the middle of the driveway, Corporal Smith holstered his weapon but then pulled his taser.   *Id.* at 33 & 41.   At this point, Watkins says he was sitting in the car with his hands out the window asking Corporal Smith not to tase him.   *Id.* at 33. Watkins asked what law he had violated and was told "obstruction." *Id.*   Watkins replied "bullshit." *Id.*   Watkins then informed Corporal Smith he had a heart condition and asked Corporal Smith not to tase him. *Id.* at 34.

When Corporal Smith tried to "make" Watkins "do commands," Watkins "let his foot off the brake again and [] let the car roll into the barbed wire fence . . . at the rear right, passenger side."   (ECF No. 38-8 at 34). Corporal Smith, who had been at the front of the vehicle, moved to the rear driver's side. *Id.* Watkins stepped out of the vehicle with his left hand up in the air and pleaded with Corporal Smith not to tase him. *Id.* When Watkins brought his right hand up in the air, he was holding a flashlight and a digital scale. *Id.* at 34-35. Watkins lost his grip of the scales he was holding and "the scales came out of [his] hand, flying to the right [about 30 feet] into a field away" from Corporal Smith. *Id.* at 36-37. Corporal Smith was to the left of Watkins. *Id.* Even though he had his hands in the air, Watkins asserts Corporal Smith shot the taser. *Id.* at 34.

Watkins concedes he was told three times to stop the car. (ECF No. 38-8 at 43). Watkins did not do so because he was afraid.   *Id.*   Watkins refused to provide Corporal Smith with his

name because he believed he had not broken any law and it was his right "to claim the Fifth Amendment." *Id.* at 48.

After he was tased, Watkins indicates he lost consciousness. (ECF No. 38-8 at 46). Because he was lying on the ground breathing in exhaust fumes, Watkins asked Corporal Smith to shut off the car.   *Id.* at 42 & 46. Watkins was told to roll over to be handcuffed. *Id.* at 46-47.

Emergency Medical Services ("EMS") was called because Watkins complained of chest pain. (ECF No. 38-8 at 47-48); *see also* (ECF No. 38-9 (Central EMS records)).   After Watkins was in the ambulance, he provided his name because he was told he was protected by HIPPA law.[2] (ECF No. 38-8 at 48).

Watkins testified he still has loss of feeling in his left side. (ECF No. 38-8 at 50). Specifically, he says he has numbness in his face, hand, and leg, and favors his left side when he walks.   *Id.* at 68-69. Watkins maintains the facial numbness is evident when he talks.   *Id.*   He can still use his left hand but he has lost some of his ability to grip. *Id.* He also has lost some balance and gets dizzy when he sits up or stands.   *Id.* at 71. He has two scars from the taser prongs – one on his left elbow and one on the left side of his torso.   *Id.* at 69.   Each scar is approximately half an inch long.   *Id.* at 69-70. Watkins does not have a medical expert who will testify the symptoms he is currently experiencing are related to the use of the taser. *Id.* at 51.

### B.  Corporal Smith's Viewpoint

Corporal Smith's narrative submitted with the preliminary report to the prosecuting attorney provides as follows:

> On October 12, 2021 I approached two vehicle[s] stopped in the roadway on West Double Springs Road.  One vehicle fled the scene and the second backed into a private drive, was revving the engine, and appeared to be unable to go forward. I

---

[2] The Health Insurance Portability and Accountability Act.

approached and the driver appeared to be panicking and began backing down the drive revving the engine and looking at me defying me advising him to stop.

I repeatedly ordered the driver to stop and he refused and continued backward running into a fence before stopping.   I order[ed] the subject out of the vehicle and he refused and upon opening the door he was advised to exit to the ground.   He exited with an[] object in his hand appeared to draw it back like he was going to use as a weapon at which point I deployed Taser and he threw the object falling to the ground.   He was cuffed and visible in the doorframe by seat was a meth pipe and upon recovering the object [it] was a digital scale.

Subject was later identified as Alvis Watkins who had suspended D.L., Felony warrants and extensive history.

(ECF No. 38-2 at 2-3).

In his affidavit, Corporal Smith states he stopped intending to "speak with the driver to see if he needed assistance." (ECF No. 38-11 at 1). When he entered the yard, Corporal Smith observed Watkins "moving the gearshift back and forth while the engine was revving. [Watkins] seemed scared and was moving so much, he appeared to be jumping around in his seat."   *Id.* at 2. Corporal Smith approached slowly and told the Watkins to stop the car.   *Id.* Corporal Smith indicates he "was walking toward [Watkins] telling him to stop the vehicle because he was rolling backwards towards a fence. After [Corporal Smith] told [Watkins] to stop, he was revving the engine louder and longer than before."   *Id.* at 2.   Corporal Smith indicates the vehicle stopped briefly and the driver "appeared to be attempting to operate the vehicle even after multiple orders from me to stop the car."   *Id.*

According to Corporal Smith, he "was in a position with a barbed wire fence behind [him] with no escape route." (ECF No. 38-11 at 2). Corporal Smith "believed the driver was attempting to put the car in gear and that it would accelerate in my direction." *Id.* Corporal Smith "drew his weapon and commanded [Watkins] several times to stop the car and then put his hands up, at least

5

three times." *Id.* Corporal Smith yelled his commands to be heard over the engine. *Id.* Corporal Smith could not hear what Watkins was saying. *Id.* The vehicle continued to roll backwards. *Id.* Watkins kept "pushing on the gas pedal" causing the engine to "rev." *Id.*

The vehicle rolled backwards until it struck the fence on the opposite side of the driveway. (ECF No. 38-11 at 3). Corporal Smith repeated his command to stop the car and Watkins "indicated he was 'trying to' but then revved the engine again." *Id.* Corporal Smith moved to a safer position and holstered his weapon. *Id.* Corporal Smith opened the driver's door to remove Watkins "from the vehicle and he jerked away from me." *Id.* Corporal Smith "drew his taser and warned [Watkins] that he was going to be tased if he did not get out of the car.   [Watkins] continued yelling at me about his car and attempting to operate it." *Id.* Watkins protested that he had not done anything and did not comply when told to "get on the ground seven or eight times."   *Id.*

When Watkins exited the vehicle, Corporal Smith

saw that he had a small black cylindrical item in his right hand along with another object.   As he came out of his car, he was moving his right arm in a chopping or throwing motion in [Corporal Smith's] direction with the object protruding from his hand.   It appeared to be an impact or cutting weapon of some sort.

(ECF No. 38-11 at 3).

Corporal Smith deployed his taser as Watkins' arm came forward. *Id.* Corporal Smith "believed that [Watkins] was trying to attack [him] with the item in his hand." *Id.* Watkins fell to the ground as soon as the taser prongs contacted his torso. *Id.* Corporal Smith gave Watkins verbal commands to "get on his stomach [and] place his arms behind him." *Id.* Corporal Smith placed Watkins in handcuffs. *Id.* at 4. Because Watkins claimed he had a bad heart and had been injured, Corporal Smith called for EMS. *Id.* Corporal Smith continued to monitor Watkins' breathing which was normal and steady. *Id.* Corporal Smith discovered the cylindrical object was a flashlight

and the thrown object a digital scale. *Id.*

> According to Corporal Smith,
>
> [t]he taser was the least amount of force that I could use to bring the incident under control in a safe manner because of the running vehicle, because [Watkins] continued to refuse my orders and argue with me, and because it appeared [Watkins] was coming at me with weapon in hand.   By using the taser, I was able to gain control of [Watkins] at a safe distance and without getting within a space where he could reach me with the weapon he appeared to have in his hand.

(ECF No. 38-11 at 5).

### C.  The Video

The Court has reviewed a video file which was created by Corporal Smith's vehicle's dash cam.   The video begins as Corporal Smith is traveling down West Double Springs Road. Corporal Smith turns off the paved road and onto a gravel road. Corporal Smith slows to stop as he approaches Watkins' and Porter's vehicles. Watkins' vehicle is in front of Porter's. Porter's vehicle appears to be pushing Watkin's vehicle forward. Porter then reverses her vehicle putting Watkins in the position to back his vehicle into a nearby driveway. At this point, Corporal Smith engages the audio feature of his dash cam.

Almost immediately, Watkins' vehicle begins backing into a driveway. As soon as Watkins' vehicle enters the driveway, Porter drives away from the scene. Corporal Smith drives his vehicle forward and off to the side of the road until the front of his vehicle is almost at the edge of the driveway.   A woman can be seen coming from a nearby home, walking toward the driveway.   A truck exits the road just past the driveway and stops. The driver exits the truck and stands at the front. The woman comes and stands with the driver of the truck.[3]

Watkins can be heard repeatedly revving the engine. The sound of the engine is extremely

---

[3] The Court has not been provided an affidavit from either eye witness.

loud.  Corporal Smith exits his vehicle and begins walking to the driveway.  As he enters the driveway, Corporal Smith can no longer be seen on the video.

Corporal Smith can be heard telling Watkins to stop the car. Watkins makes some response, but it is indiscernible. Corporal Smith orders Watkins to stop the car three separate times. During this time, Watkins continues to rev his engine numerous times. Corporal Smith then repeatedly tells Watkins to get his hands up. Watkins says something about a flashlight. Watkins then says he is trying to shut the car off but cannot. Watkins continues to rev the engine. Watkins makes an additional statement or two, but the words are not discernable. Corporal Smith tells Watkins repeatedly to get out on the ground or he will be tased. Watkins objects to being tased saying multiple times that he had done nothing wrong. Watkins then says he is "going to" and to "hold on."  Watkins repeats that he is going to get on the ground. The taser is deployed. Watkins can then be heard making sounds as if he is in pain. Corporal Smith directs Watkins to get on his stomach. Watkins repeatedly says he has a bad heart. Corporal Smith calls for EMS.   The two continue to talk through the remainder of the video/audio file.

### D.  After the Arrest

Watkins was taken by ambulance to Northwest Health ER Fayetteville. (ECF No. 38-4 at 3).  He was diagnosed with intercostal pain – chest wall pain – and prescribed Naprosyn. *Id.*; (ECF No. 38-10 at 23).

Watkins was booked into the Washington County Detention Center ("WCDC") on October 12, 2021.  (ECF No. 38-2 at 1). He was charged with possession of drug paraphernalia, obstruction of governmental operations, no insurance, driving on a suspended license, and criminal mischief.  (ECF No. 38-2 at 2).

He remained incarcerated at the WCDC until October 18, 2021, when he was released on bond. *Id.* at 7. At the time of his release, Watkins was able to walk. (ECF No. 38-8 at 54). Following his release, he did not seek medical treatment, but recuperated for approximately three weeks at a friend's house. *Id.* at 54-56.   Watkins did not work until early November 2021 when he began work on a property, cleaning out and burning brush, and loading a trailer full of trash. *Id.* at 55-57.   He worked there for four to five days, and the job ended on November 12, 2021. *Id.*

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."   *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).   A fact is "material" if it may "affect the outcome of the suit."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."   *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is

9

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007).

### III.    DISCUSSION

Corporal Smith contends he is entitled to judgment in his favor for the following reasons:

(1) the force he used against Watkins was objectively reasonable considering the circumstances;

(2) he is entitled to the protections afforded by qualified immunity; and (3) there is no basis for

official capacity liability.   In the supplemental Motion, Corporal Smith raises these additional

arguments: (1) the Court should abstain on the issue of probable cause as Watkins' criminal case

remains pending; (2) Watkins has no standing to object to Smith's entry onto property that Watkins

does not own; and (3) Smith was legally justified in approaching and detaining Watkins.

### A.   Entry onto Private Property

Watkins argues Corporal Smith could not lawfully enter onto private property to arrest him.

In opposition, Corporal Smith argues that he was simply exercising his community caretaking

function when he entered the property. Corporal Smith further argues that Watkins has no standing

to object to his entry onto private property owned by another.

"The right of people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend IV. "Fourth

Amendment rights are personal rights which, like some other constitutional rights may not be

vicariously asserted." *Brown v. United States,* 411 U.S. 223, 230 (1973). The Supreme Court has

held that "capacity to claim the protection of the Fourth Amendment depends . . . upon whether

the person who claims the protection of the Amendment has a legitimate expectation of privacy in

the invaded space." *Rakas v. Illinois,* 439 U.S. 128, 143 (1978). Generally, the courts look to the relationship of the third person to the property to determine if the third person may claim a violation of his Fourth Amendment rights. *Id.* at 134.

Watkins did not own the property or even know who owned it; he had never been to the property before the date of his arrest; and he had neither permission to enter the property nor permission to place his vehicle on the property.[4]   In short, Watkins had no ownership, social, or consensual relationship to the property and had no reasonable expectation of privacy sufficient to confer standing under the Fourth Amendment. *See Minnesota v. Carter,* 525 U.S. 83, 91 (1998) (Respondents, who had no prior relationship with the lessee of an apartment, came to the apartment for the sole purpose of packaging cocaine – which took 2 ½ hours and thus Respondents had no legitimate expectation of privacy in the apartment and no standing to challenge the search). Further, the Eighth Circuit has held that no search occurs when the officer's movements are restricted to those areas made accessible to visitors, including driveways. *See e.g., United States v. Cicneros-Gutierrez,* 598 F.3d 997, 1005 (8th Cir. 2010) ("[N]o Fourth Amendment search occurs when officers restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways") (cleaned up). For these reasons, Watkins cannot prevail on any claim that Corporal Smith illegally entered the driveway of the property, and Corporal Smith is entitled to summary judgment on this claim.

**B.   Probable Cause for Arrest**

The Court agrees with Corporal Smith that any claim he lacked probable cause to arrest Watkins would be barred by the abstention doctrine of *Younger v. Harris,* 401 U.S. 37 (1971).

---

[4] Watkins points out that the home owner brought no charges against him for property damage.   (ECF No. 49 at 1). This fact has no bearing on the issues before the Court.

Under *Younger,* federal courts are required to abstain from hearing cases when "(1) there is an ongoing state judicial proceeding which (2) implicates important state interests, and when (3) that proceeding affords an adequate opportunity to raise the federal questions presented." *Norwood v. Dickey,* 409 F.3d 901, 903 (8th Cir. 2005) (cleaned up). If all three questions are answered affirmatively, a federal court should abstain unless it detects 'bad faith, harassment, or some extraordinary circumstance that would made abstention inappropriate.'" *Night Clubs, Inc. v. City of Ft. Smith, Ark.,* 163 F.3d 475 (8th Cir. 1998) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 435 (1982)).

Here, the criminal case against Watkins is ongoing. This Court recognizes there are important state law interests in enforcing the state's criminal laws and in allowing state courts to administer their own cases. Abstention honors a state's interest in carrying out the task of enforcing its criminal laws. *Hicks v. Miranda,* 422 U.S. 332, 349-51 (1975).

Watkins has not identified any barrier to his ability to raise his constitutional challenges in state court. Watkins maintains the Court should not abstain "because defendant acted in 'bad faith' [when he] knowingly let the blue car drive away with bad tags, which is a traffic violation on [a] public roadway." (ECF No. 50 at 5). Watkins asserts Corporal Smith "knowingly" harassed him "by coming on to private property, when [he] did not violate any traffic laws by backing his vehicle into the private driveway to work on his malfunctioning vehicle in a safe place." *Id.* at 5-6.

The Court believes Corporal Smith's act of not pursuing Porter's vehicle does not establish bad faith vis a vie Watkins. Rather, it bolsters Corporal Smith's position that he was initially trying to determine if Watkins needed assistance with his vehicle. As discussed above, Watkins had no

12

expectation of privacy in the stranger's driveway. The Court finds no evidence in the record of bad faith on the part of Corporal Smith or evidence of any other extraordinary circumstance which would make abstention inappropriate. In cases such as this one, where damages are sought, a stay rather than a dismissal is warranted, and this is what the Court will recommend. *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 720 (1996).

### C. **Excessive Force**

"The Fourth Amendment protects citizens from being seized through excessive force by law enforcement officers." *Thompson v. Monticello, Ark.,* 894 F.3d 993, 998 (8th Cir. 2018) (cleaned up). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Coker v. Ark. State Police,* 734 F.3d 838, 842 (8th Cir. 2013) (cleaned up). This determination is made without regard to the officer's subjective intent or motivation. *Zubrod v. Hoch,* 907 F.3d 568, 575 (8th Cir. 2018) (quoting *Loch v. City of Litchfield,* 689 F.3d 961, 965 (8th Cir. 2012)).

In evaluating an excessive force claim under the Fourth Amendment, a court must consider whether the force was objectively reasonable under the circumstances, "rely[ing] on the perspective of a reasonable officer present at the scene rather than the '20/20 vision of hindsight.'" *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386 (1989). Application of this standard requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. "The calculus of reasonableness

13

must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-397.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d. Cir. 1973)). In order to conduct an arrest, some degree of force is necessary. *Graham,* 490 U.S. at 396. Therefore, the fact that force is used during an arrest does not *ipso facto* establish a Fourth-Amendment violation. *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003) ("Fourth Amendment jurisprudence has long recognized…the right to make an arrest…necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.") (cleaned up). "A threat to an officer's safety can justify the use of force in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee." *Brown v. City of Golden Valley,* 574 F.3d 491, 497 (8th Cir. 2009).

Here, it is undisputed that the encounter began with Corporal Smith attempting to determine if Watkins needed assistance with his vehicle.

> Police officers, unlike other public employees, tend to be 'jacks of all trades,' who often act in ways totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law. *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973). These activities, which are undertaken to help those in danger and to protect property are part of the officer's 'community caretaking functions.'" *Id.* They are unrelated to the officer's duty to investigate and uncover criminal activity.

*United States v. Quezada,* 448 F.3d 1005, 1007 (8th Cir. 2006). Checking on a motorist who appears to have a disabled vehicle falls precisely into the non-criminal community caretaking

function.  The encounter between Watkins and Corporal Smith which the Court must analyze

began in this way. *See Cady v. Dombrowski,* 413 U.S. 433, 441 (1973) (non-criminal community

caretaking function includes responding to disabled vehicles or investigating accidents)[5]; *South

Dakota v. Opperman,* 428 U.S. 364, 369 (1976)(Under a community caretaking function, the

"authority of police to seize and remove from the streets vehicle impeding traffic or threatening

public safety and convenience is beyond challenge"); *United States v. Salgado,* 761 F.3d 861, 865

(8th Cir. 2014)("Police officers reasonably may engage in a community-caretaking function with

respect to motor vehicles and traffic, and [officer's] exercise of that function in approaching a

disabled vehicle did not amount to a seizure requiring probable cause or reasonable suspicion of

criminal activity").

     As previously described, two vehicles were initially present in the roadway.  Porter's

vehicle drove away as soon as Corporal Smith arrived. Watkins then began backing his vehicle

into the driveway. According to Watkins, the transmission would not work in drive – it would not

move forward – or stay in park.   (ECF No. 38-8 at 22 & 28-29). He was "trying to get it to where

it would stay, trying to shut it off and turn it on to get the computer reset so it would engage in

---

[5] In *Caniglia v. Strom,* ___ U.S. ___, 141 S. Ct. 1596 (2021), the Supreme Court stressed that "this recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere." *Id.* at 1599-1600.  In *Caniglia,* the police were called by Caniglia's wife to perform a welfare check.  Caniglia was on the porch and confirmed that he had argued with his wife the day before, retrieved a handgun from the bedroom, put in on a dining room table, and asked his wife to "shoot [him] now and get it over with." *Id.* at 1598.  After Caniglia agreed to go to the hospital for a psychiatric evaluation and left by ambulance, the officers entered the home and took two handguns.  *Id.*  The officers lacked a warrant or consent, and were not responding to a crime.  *Id.* at 1599.  The First Circuit Court of Appeals, affirming the district court, found the "decision to remove [Caniglia] and his firearms from the premises fell within a 'community caretaking exception' to the warrant requirement."  *Id.* at 1598.  The Supreme Court reversed and noted that *Cady* considered in context clearly distinguished between vehicles and homes.  *Id.* at 1599.  The Supreme Court stated it had previously declined to "'expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home.'"  *Id.* at 1600 (quoting *Collins v. Virginia,* ___ U.S. ___, 138 S. Ct. 1663, 1672 (2018)).

park." *Id.* at 29.   Watkins agrees that Corporal Smith was trying to see what was wrong and was not pulling him over or trying to arrest him at this point. *Id.*

Watkins testified that the engine revved up whenever he hit the gas. (ECF No. 38-8 at 38). Watkins was revving the engine up before Corporal Smith drew his weapon. (ECF No. 38-8 at 38). Further, Watkins indicated he was scared and moving around in the car. (ECF No. 38-8 at 38). Watkins does not believe Corporal Smith knew he was trying to park the vehicle. *Id.; see Nelson v. Cnty. of Wright,* 162 F.3d 986, 990 (8th Cir. 1998) ("The issue of reasonableness must be examined from the perspective of the facts known to the officer at the time of the incident").

With Watkins revving the engine, refusing to obey commands, and having no knowledge that Watkins would not be able to engage the transmission in drive or park, it was reasonable for Corporal Smith to fear for his own safety. Further, when Watkins did finally exit the car, he had items in his right hand – one of which went flying with enough force to travel approximately thirty feet before landing; applying common sense suggests this was not merely loss of grip of an item and provided further justification for the use of reasonable force. Construing the facts in the light most favorable to Watkins and judging the situation from the perspective of a reasonable officer on the scene, the Court concludes Corporal Smith did not use excessive force in deploying the taser as it was objectively reasonable for him to interpret Watkins' actions as a realistic threat to his personal safety. The circumstances were "tense, uncertain, and rapidly evolving." *Graham,* 490 U.S. at 397; *see also Procknow v. Curry,* 826 F.3d 1009, 1014 (8th Cir. 2016) (consideration should be given to the timing, warnings, and physical capacity of the subject); *Lawyer v. City of Council Bluffs,* 361 F.3d 1099 (8th Cir. 2004) (objectively reasonable for officer to deploy pepper spray when driver began to roll up the window onto the officer's arm).   Corporal Smith is entitled

16

to summary judgment on this claim.

### D.   Qualified Immunity

Remaining for consideration is Corporal Smith's claim of qualified immunity. Qualified immunity ensures that government officials performing discretionary functions "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).   "The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation . . . . There are serious and legitimate reasons for this.   If a Government official is to devote time to his or her duties . . . it is counterproductive to require the substantial diversion that is attendant to participating in litigation." *Ashcroft v. Iqbal,* 556 U.S. 662, 685 (2009) (cleaned up).

Qualified immunity protects an official "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011). The Court may decide the two prongs in either order.   *Id.* Corporal Smith is "entitled to qualified immunity unless the answer to both questions is yes." *McCaster v. Clausen,* 684 F.3d 740, 746 (8th Cir. 2012).

Having already answered the first prong of the qualified immunity inquiry in the negative with respect to both illegal entry onto the property and excessive force, Corporal Smith is entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### E.  Official Capacity

In his Complaint (ECF No. 1 at 5), Watkins indicated he is suing Corporal Smith in both

his individual and official capacities.   While Watkins initially testified in his deposition that he was suing Corporal Smith in his individual capacity only, Watkins then clarified he was also suing Washington County. (ECF No. 38-8 at 66-67). Watkins believes Washington County is liable to him because Corporal Smith was employed by the County. *Id.* at 67. If Corporal Smith does something wrong, Watkins believes Washington County is liable; however, Watkins does not believe that any of the County's policies, practices or customs caused the violation of his constitutional rights.   *Id.* at 65.

Watkins' theory of liability is simply incorrect. In *Monell,* the Supreme Court held that "a [governmental entity] cannot be held liable solely because it employs a tortfeasor—or, in other words, a [governmental entity] cannot be held liable under § 1983 on a *respondeat superior* theory."   *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978). Washington County may be sued under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."   *Id.* at 694. Furthermore, "[w]ithout a constitutional violation by the individual officers, there can be no § 1983 or Monell ... liability."   *Sanders v. City of Minneapolis, Minn*., 474 F.3d 523, 527 (8th Cir. 2007).   Since Corporal Smith did not violate Watkins' constitutional rights, Washington County cannot be held liable under § 1983. *Lombardo v. City of St. Louis,* 956 F.3d 1009, 1015 (8th Cir. 2020).   Accordingly, Corporal Smith is entitled to summary judgment on the official capacity claims.

## IV.   CONCLUSION

For the reasons set forth above, the undersigned recommends that Corporal Smith's Motion for Summary Judgment (ECF No. 36) and Supplemental Motion for Summary Judgment (ECF

No. 46) be **GRANTED, save and except for the recommended stay under *Younger*, as follows**:

- all of Watkins' Fourth Amendment claims based on Corporal Smith's entry onto the driveway of a third party be **dismissed with prejudice;**

- all of Watkins' Fourth Amendment excessive force claims be d**ismissed with prejudice;**

- all official capacity claims be **dismissed with prejudice;** and

- the Court abstain under the *Younger* doctrine from the exercise of jurisdiction over Watkins' claim that Corporal Smith lacked probable cause to arrest him.  This claim should be **stayed during the pendency of Watkins' state court criminal case.**  The case may be reopened upon proper motion after the conclusion of the criminal trial if any issues remain for determination.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of January 2023.

*Christy Comstock*

CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE